### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| PELOTON INTERACTIVE, INC., | Civil Action No.: |
| *Plaintiff*, | |
| vs. | **JURY TRIAL DEMANDED** |
| FLYWHEEL SPORTS, INC., | |
| *Defendant*. | |

### COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Peloton Interactive, Inc. ("Peloton") brings this action against Flywheel Sports, Inc. ("Flywheel"), and alleges as follows:

### SUMMARY OF THE ACTION

1.      In 2011, Texas native John Foley was struggling to find time to exercise.  His favored workouts were in-studio cycling classes, which provided him with the perfect mix of competition and community.  But as the president of e-commerce at Barnes & Noble, and a husband and father of two, it was nearly impossible for him to find time to schedule and attend in-studio classes.  At the same time, there was no at-home exercise option that provided anything close to the experience of an in-studio class.  A graduate of Georgia Tech and Harvard Business School, Foley set out to solve this problem with his technical and business acumen.  Soon thereafter, Foley established Peloton with the goal of creating a product that would bring the studio exercise class experience directly into a person's own home.  This led to the invention of the Peloton Bike, which Foley, along with his co-founders, developed and brought to market in 2012.

2.      The Peloton Bike is the first ever at-home exercise bike that incorporates a sophisticated graphical user interface—presented on a 22-inch HD, multitouch tablet—that displays live and on-demand cycling classes led by some of the world's most elite instructors. The Peloton Bike uses sensors to measure the rider's performance and can display a leaderboard comparing the rider's performance at each point in the class with the performance of every other rider that is currently taking—or has ever taken—the same class. This "Leaderboard" is a unique technology that allows Peloton riders to see how their performance ranks in comparison to all other riders at every point in the class.

3.      The invention of the Peloton Bike solved two major problems for would-be exercisers. First, it allowed busy Americans—from harried executives to sleepless new parents—the flexibility to exercise in their own home and on their own schedule. Second, it gave them the motivation to do so, by providing live and on-demand classes that recreate the real-time competition and community engagement that has made in-studio classes so popular. To protect this invention, Foley and Peloton applied for, and received, the U.S. Patents at issue in this case.

4.      Since its inception in 2012, Peloton has disrupted the fitness industry, creating a new category of fitness equipment with its remarkable success. In less than six years, Peloton has delivered over 250,000 Peloton Bikes, and established a member base of more than 600,000 active riders. The Peloton Bike has received near-universal adulation, with Men's Health naming it "the best cardio machine on the planet." Peloton now employs more than 900 people across the country, with plans to hire hundreds more, including at a major new campus in Plano, Texas. Peloton was recently valued at $4.15 billion and earned more than $300 million in revenue in 2017 alone.

5.       Defendant Flywheel, on the other hand, primarily operates studio cycling classes in brick-and-mortar locations across the country.  In or around 2017, having witnessed Peloton's success—and knowing that it had been losing customers to Peloton—Flywheel decided it needed to shift gears.  But rather than innovating and investing, as Peloton had, Flywheel infringed the Peloton Patents by creating a copycat of the Peloton Bike experience called the "FLY Anywhere" that, among other things, detects, synchronizes and compares the ride metrics of remote users on a graphical user interface.  With its FLY Anywhere bike, Flywheel infringes the Peloton Patents by, among other things, displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders.

6.       Flywheel's infringement of Peloton's patents is ongoing and willful.  Indeed, just three months before Flywheel announced its development of the FLY Anywhere bike, one of its largest investors, Michael Milken—the prominent businessman previously convicted of securities law violations—attended a private investment conference for high net worth investors to meet with the chief executives of several companies, including Peloton.  At that conference, Milken falsely presented himself to Foley as a potential investor in Peloton and pressed for—and obtained—information from Foley about Peloton's technology and business strategy—all without ever disclosing his existing multi-million-dollar investment in Flywheel.  On information and belief, Milken provided this information to Flywheel, which then used this information to facilitate the development, sales and marketing of the infringing FLY Anywhere bike.

7.       Peloton brings this suit to protect its rights and put an end to Flywheel's willful infringement.

## THE PARTIES

8.      Peloton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 125 West 25th Street, 11th Floor, New York, New York, 10001.  Peloton has a showroom and sales office in Plano, Texas, located at Legacy West, 7500 Windrose Avenue, Plano, Texas 75024. In addition, Peloton recently announced that it is opening its second corporate headquarters in Plano's Legacy Central development, where it plans to hire 400 workers over the next several years.

9.      Flywheel is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 53 West 23rd Street, Floor 9, New York, New York 10010.

## JURISDICTION AND VENUE

10.     Certain claims in this civil action arise under the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject matter jurisdiction over the patent claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has personal jurisdiction over Flywheel pursuant to the laws of the State of Texas and the United States Constitution because Flywheel regularly and continuously transacts business in the jurisdiction, including marketing and selling Flywheel services and products throughout the State of Texas, including in this district.  Flywheel places infringing products within the stream of commerce, which stream is directed at this district, with knowledge and/or understanding that those products will be sold in the State of Texas, including in this district.

12.     Flywheel has infringed or caused infringement in the State of Texas, including in this district by, among other things, promoting, offering for sale and selling the infringing FLY

4

Anywhere bike in the District.  Flywheel also provides services and assembles products that are

and have been used, offered for sale, sold, and purchased in the State of Texas, including in this

district.  Flywheel has at least three physical locations at which it transacts business and recruits

and hires employees in the State of Texas, including in this district.  Flywheel has registered with

the Texas Secretary of State's Office to do business in the State of Texas and has appointed a

registered agent for service.  Therefore, the exercise of jurisdiction over Flywheel is appropriate

under the applicable jurisdictional statutes and would not offend traditional notions of fair play

and substantial justice.

13.     Venue is proper for claims of patent infringement in this district under 28 U.S.C.

§§ 1391(b) & (c) and 1400(b) because Flywheel has a regular and established place of business

within the district and has committed, and continues to commit, acts of patent infringement

within the district.

14.     Flywheel owns and operates a Flywheel studio in this district at 5964 West Parker

Road, Suite 100, Plano, Texas 75093.  At this location, Flywheel owns or rents real estate, hires

and pays employees, advertises in the community, and engages in business.  In addition, from

this location, Flywheel has promoted, offered for sale, and sold the infringing FLY Anywhere

bike.  Flywheel Plano likewise actively promotes for sale the infringing FLY Anywhere bike on

its Facebook page.

15.     Flywheel actively markets and sells the FLY Anywhere bike to customers across

the United States, including in the Eastern District of Texas.

16.     Additionally, Flywheel has a showroom for the infringing product—the FLY

Anywhere bike—in Dallas, Texas, less than 20 miles from the Eastern District of Texas.

Flywheel intends to and does advertise, demonstrate, offer for sale, and sell the infringing

product and services to customers in the Eastern District of Texas through this showroom. Flywheel intends for customers to use the infringing product and service within the Eastern District of Texas.

## FACTUAL ALLEGATIONS

### I.    Disrupting the Fitness Category

17.    Since being founded in early 2012, Peloton has revolutionized the fitness industry with its category-creating at-home cycling bike (the "Peloton Bike").  Unlike the at-home bikes that came before it, the Peloton Bike is a sleek, technologically advanced system that combines a first-in-class exercise bike with state-of-the-art technology that allows riders to experience live and on-demand cycling classes—led by some of the world's best instructors—from the comfort of their own homes.

18.    Featuring a 22-inch full high-definition, sweat resistant, multitouch tablet, the Peloton Bike measures and displays a rider's performance metrics and presents those metrics for live or time-synced comparison with other Peloton riders.  This unique technology allows Peloton riders to see where their performance stands against all other riders on a leaderboard, re-creating the energetic and competitive in-studio cycling experience at home.



*Above: The Peloton Bike*



*Above: The Peloton Graphical User Interface and Leaderboard*

19.     Peloton's success has been remarkable.  Men's Health has called the Peloton Bike "the best cardio machine on the planet."  USA Today has said it is "attractive, addictive, and seriously whips you into shape."  And in a comparison of numerous at-home bikes, the Wall Street Journal concluded that "the best bike, by far, was [the] Peloton."  The Peloton Bike also received the award for the Best Health and Fitness Device at the Consumer Electronics Show in 2018.

20.     The Peloton Bike retails for $1995, and riders pay $39 per month for a subscription to Peloton's exclusive live and on-demand cycling classes.

21.     To date, Peloton has delivered more than 200,000 Peloton Bikes, building its member base from zero to over 600,000 in less than five years.  Its revenue has been growing rapidly as a result.  For example, in 2016, Peloton's revenue nearly tripled to $170 million, and in 2017, doubled again to over $300 million.  Peloton has also won countless awards, including being named one of the World's Most Innovative Companies by Fast Company in 2016, 2017 and 2018.

## II.     The Journey to Inventing the Peloton Bike

22.     At the time Peloton was founded, fitness studios that provided studio cycling classes were becoming tremendously popular.  SoulCycle and Flywheel had multiple studios and were growing quickly.  While such in-studio classes provide a great consumer experience, they start at predetermined times, have limited space per class, and may meet at inconvenient locations for some customers.  As a result, in-studio classes can be hard to attend for people with busy work schedules and families at home.  Peloton founder and CEO John Foley was one of those people.

23.     After realizing that countless others undoubtedly faced the same challenge, Foley began a journey that would see him and his co-founders invent a new category of fitness equipment that provides the immersive, fun and competitive in-studio cycling class experience, at home, at any time.

24.     Having majored in industrial engineering at Georgia Tech and studied business at Harvard Business School, Foley then worked in e-commerce and the tech industry for over a decade.  This gave him a sophisticated understanding of the intersection of business and technology.  However, Foley also realized that this project would require a team of smart, savvy leaders in different fields to bring it to consumers, and he therefore started recruiting other tech leaders who shared his vision.

25.     Foley first approached his friend and former colleague, Tom Cortese.  Over dinner one night in 2011, Foley told Cortese that he believed there was a large, untapped market available if they could just figure out how to allow cycling fans to access the best instructors and have the same in-studio cycling class experience at any time, no matter where they live and no matter how busy their schedules are.  Cortese joined, and has been with Peloton ever since, currently serving as Peloton's Chief Operating Officer.

26.     Foley also recruited three others, whom he asked to join as co-founders of Peloton: technological guru Yony Feng, to help design and build a prototype Peloton Bike; accomplished lawyer Hisao Kushi, to guide Peloton through the legal and regulatory framework facing the new start-up; and internet executive Graham Stanton, to help guide the company through its early years and to manage the company's finances and growth strategy.  All accepted, and all three remain with the company to this day.  Feng is Peloton's Chief Technology Officer;

Kushi is General Counsel; and Stanton is Senior Vice President, Global Marketing and Sales, Peloton Digital.

27.     With a strong team in place, Foley was able to raise an initial seed investment of $350,000, along with $50,000 of Foley's own savings. This allowed the young start-up to rent a small office in New York City from which it could develop and create the first prototype of the Peloton Bike.

28.     To create the product that Foley and his co-founders envisioned, Peloton developed (1) a visually appealing, sturdy, and technologically advanced exercise bike; (2) a large, sweatproof, wi-fi enabled, high-definition touchscreen tablet computer; (3) an attractive user interface and related software and backend systems to integrate the bike and tablet and track, synchronize, and dynamically display metrics; and (4) first-in-class cycling class content and the systems to deliver that content.  All equipment needed to be durable, lasting for years with minimal maintenance.

29.     Start-ups will often partner with existing companies and products to custom build as little as possible.  Building one's own hardware and software from the ground up, by contrast, is expensive, time-consuming, and fraught with obstacles, known and unknown.  However, Peloton quickly discovered that no existing exercise bike had all the required characteristics: sturdiness, durability, visual appeal, efficiency, and technological capability.  Nor was there any touchscreen tablet available on the market at the time that would suit its needs.  In addition, Peloton realized that no existing products could communicate with the bike hardware, or track and analyze rider performance in the way they envisioned.  In short, the Peloton team quickly realized that it would need to create virtually the entire Peloton Bike from scratch, including the bike and tablet.

30.     What's more, to effectuate its vision of immersive studio cycling at home, Peloton also needed to figure out how to integrate the hardware (the bike and tablet) with its own software so that the software could communicate with the bike to track performance metrics, store those metrics, communicate those metrics back to the rider, and transfer those metrics to a server so that they could be synchronized and compared with other riders' metrics.

31.     The technological challenges and unknowns faced by the Peloton team also created a significant financial hurdle.  Investors viewed Peloton's plan to build its own hardware and software as too costly and difficult and were not convinced there was a viable market for the product.  Dozens of investors declined the opportunity to invest in Peloton because they were not willing to take the risk of investing up front in such a new and challenging endeavor.

32.     Yet through research, ingenuity, and persistence, Peloton pushed on, working with two core manufacturing partners to design and produce the necessary high-tech, sleek bikes and tablets.  To build the first prototype, Feng, the Chief Technology Officer then and now, created a proof-of-concept apparatus using a standard off-the-shelf stationary bike, then attaching sensors with a stripped-down electronics board running the Android-based app that he developed and a computer monitor rigged to the bike's front.  As reflected in the images below, Feng went through a long, iterative process to develop a successful hardware-software integration.

*The Peloton Bike's software and tablet evolution:*



11

*The early version of the Peloton Bike, left, compared with the version at launch, right:*

 

*Testing the software with an early version of Peloton Bike:*

 

33.     This unique hardware-software integration would be the basis for Peloton's prototype.  By the end of 2012, after a year of hard work, investment, and development, Peloton finally had a prototype in hand to show investors.

34.     But even after the Peloton Bike prototype was created, Peloton struggled to raise money.  Foley was rejected by countless investment firms and was repeatedly told that the Peloton Bike simply was not viable.

35.     Early in 2012, Peloton had discussions with Defendant Flywheel about a potential partnership.  The proposal was that Peloton would become the interactive arm of Flywheel to develop the at-home cycling business using Flywheel's instructor-led, studio class content, and Flywheel would focus on its existing studio cycling business.  Flywheel was initially interested, but eventually the deal fell through.

36.     Yet, despite these repeated rejections, Foley persisted—continuing to take risks, making significant personal investments, and dedicating more time to developing the best possible product.  He did so because of his belief that at-home fitness equipment simply had not evolved at the same pace that group exercise classes had.  He continued to pitch potential investors until, many rejections later, he found a group of investors who believed in Peloton and invested the first $10 million that helped launch the Peloton Bike on a commercial scale.

**III.     <u>Bringing Peloton to Market</u>**

37.     After additional troubleshooting and tinkering on the early prototype bikes, Peloton was ready to take the important step of manufacturing the bike and selling it to its first customers.  Peloton held a Kickstarter campaign with the goal of raising enough capital to start manufacturing the bike.   As Peloton explained, "[t]his involves building the 'tools' required to create each unique part (yes, we first have to build the machinery that will build the bike!) and

pre-purchasing lots of steel, aluminum, plastic, microchips (there are 17 in our console alone)."
The Kickstarter campaign raised more than $300,000 and generated initial orders for 188 bikes.

38.     Sales were initially slow—188 bikes was far from Peloton's target, and far from
the demand Foley knew existed.  Peloton was a new product, and people were wary of the
product and how useful it would be.  Like every other phase of their journey, Peloton was not
going to become successful overnight—they were going to have to work for it. With intensive
and creative marketing efforts, including pop-up stores in choice locations, and as word of mouth
spread, sales began to pick up.

39.     In January 2014, two years after Peloton was founded, the first bikes were
delivered to customers.

40.     By now, Peloton has designed in-house almost everything that other companies
outsource to third parties: hardware, software, content, and logistics.  As an Inc.com article
reported, "Peloton has defied every aspect of the prevailing startup ethos of doing it fast and
lean, buying off the shelf, partnering and, above all, custom-building as little as possible."  It
likewise described that Foley and his team have "[broken] every rule" to make Peloton a reality.

41.     It is a reality that continues to grow and exceed expectations.  In its latest
investment round, Peloton raised $550 million at a valuation of $4.15 billion.  Peloton continues
to expand both nationally and internationally, and it will soon open a second headquarters in
Plano, Texas, which will employ hundreds of workers.  Most importantly, Peloton is doing what
it set out to do—allowing more people than ever to participate in high-energy, state-of-the-art
exercise on their own schedule, and empowering riders to maximize their most valuable
resource: time.

IV.    **Peloton Patents Its Intellectual Property**

42.    After years of investment, risk, and innovation, Peloton has become the leader of the at-home fitness world.  To protect its intellectual property, Foley and the Peloton inventor team have applied for, and received patents covering, their inventions.

43.    United States Patent No. 9,174,085 ("the '085 Patent"), entitled *Exercise System and Method*, was duly and lawfully issued on November 3, 2015.  A true and correct copy of the '085 Patent is attached hereto as Exhibit 1.

44.    United States Patent No. 9,233,276 ("the '276 Patent," and collectively with the '085 Patent, the "Peloton Patents"), entitled *Exercise System and Method*, was duly and lawfully issued on January 12, 2016. A true and correct copy of the '276 patent is attached hereto as Exhibit 2.

45.    Plaintiff Peloton Interactive, Inc. is the current owner of all rights, title, and interest in and to the Peloton Patents.  With its Peloton Bike, Peloton practices the Peloton Patents by, among other things, displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that remote rider's performance against the performance of other remote riders.  Peloton thus manufactures and sells a commercial embodiment of the Peloton Patents, including the Peloton Bike with a subscription to Peloton classes.

V.    **Flywheel's Notice of the Peloton Patents**

46.    In May 2017, Flywheel issued a press release stating that it would release a product similar to the Peloton Bike, called the FLY Anywhere bike.  With its FLY Anywhere bike, Flywheel infringes the Peloton Patents by, among other things, displaying live and archived cycling class content to remote riders, tracking a remote rider's performance, and comparing that

remote rider's performance against the performance of other remote riders.  Flywheel markets the FLY Anywhere bike by informing riders that they can "bring [Flywheel's] epic in-studio experience, right to your place."  In the following months, Flywheel continued to advertise its impending launch of the FLY Anywhere bike in the fall of 2017.

WHAT IS FLY ANYWHERE?



FLY Anywhere is the high-performance bike that brings our epic in-studio experience, right to your place.



*Above: Images of the FLY Anywhere bike and its copycat leaderboard.*

47.     On October 24, 2017, Peloton sent a letter to Flywheel's Chief Executive Officer and Executive Chairman, informing him of, among other things, the '085 and '276 Patents, as well as Peloton's belief that the soon-to-be-released FLY Anywhere bike would infringe Peloton's patents and published patent application.  Flywheel thus had actual notice of the '085

and '276 Patents no later than October 24, 2017.  Despite Peloton's notice letter, Flywheel

launched the FLY Anywhere bike in mid-November 2017.

## VI.    **Flywheel's Willful Infringement**

48.    While Peloton was investing in and developing its at-home cycling experience,

Flywheel was growing its in-studio cycling business.

49.    Flywheel is a boutique fitness brand with 43 studios across the country.  From

Flywheel's inception until late 2017, Flywheel offered only in-person studio cycling classes,

with bikes laid out in a stadium format.  Classes are taught by live instructors.  Riders can view

various performance metrics and compete against each other in real time in a group setting.

50.    While companies like Flywheel provided an exciting and competitive in-studio

experience, Peloton was the only company to think beyond the studio experience—which has

both time and space constraints—to focus on creating the technology and product that would

allow the experience to be transported into the home.

51.    In 2012, as described above, Flywheel rejected the opportunity to partner with

Peloton to develop an at-home cycling business.  By 2016, things changed.  Peloton's success

was impossible to ignore.  Flywheel and SoulCycle, leaders in the popular studio-based cycling

industry, both publicly expressed their interest in expanding into the at-home cycling market.

52.    In February 2017, three months before Flywheel announced the FLY Anywhere

bike, J.P. Morgan held its invitation-only Alternative Investments Summit in Miami Beach for a

select group of extremely high net worth individuals, including numerous billionaires and

veteran investor Michael Milken.  J.P. Morgan invited business leaders, including Foley, as the

founder and CEO of Peloton, to present to the potential investors about the opportunity to invest

in their companies.  At the Summit, Foley pitched to a group of more than one hundred potential investors about an investment opportunity in Peloton.

53.     After the group presentation, a series of eight 20-minute exclusive time slots were reserved for the most interested potential investors to meet one-on-one with Foley.  These one-on-one meetings were offered so that the most interested investors could ask specific questions and learn further details about Peloton that were not addressed in the more public group presentation, for the purpose of making a final decision on whether to invest in Peloton.

54.     Milken posed as an interested investor in Peloton and sought one of these exclusive slots to speak with Foley.  Ultimately, Milken ended up taking two of the eight 20-minute time slots—a quarter of Foley's valuable face-to-face fundraising time with extremely qualified and interested investors—during which Milken held himself out to Foley as an interested, potential investor in Peloton and pushed for information on topics including Peloton's future business plans and strategy, and how or whether Peloton could protect its intellectual property and exclude others from the at-home cycling business.  Foley answered these questions truthfully, and Milken understood that information provided to him in the one-on-one session was intended solely for the purpose of determining whether to invest in Peloton.

55.     At no time before, during or after the meeting did Milken disclose that he had any financial interest whatsoever in Flywheel.  Yet approximately one month later, Foley confirmed that Milken was actually one of the largest investors in Flywheel.

56.     On information and belief, Milken knew that Flywheel was developing a competitor to the Peloton Bike and intentionally chose not to disclose this serious conflict of interest to J.P. Morgan, Foley, or anyone associated with Peloton.  Milken's purpose was to acquire information that could help Flywheel, in which he was heavily invested.

57.    On May 17, 2017, three months after Milken met with Foley, Flywheel publicly announced the development of an at-home bike that would directly compete with Peloton.

58.    In or around November 2017, Flywheel began making, using, selling, and offering for sale the FLY Anywhere bike, which infringes the Peloton Patents.  The FLY Anywhere bike, like the Peloton Bike, allows riders to access live and archived cycling classes from the comfort of home, including tracking, synchronizing, and comparing performance metrics of the at-home rider and other riders.

59.    Flywheel markets the bike by informing riders that they can "bring [Flywheel's] epic in-studio experience, right to your place."

60.    Flywheel actively markets and sells the FLY Anywhere bike to customers across the United States, including in the Eastern District of Texas.

61.    The FLY Anywhere bike is also available for purchase on Flywheel's website. Flywheel offers to ship the FLY Anywhere bike to any location in the continental United States.

62.    The FLY Anywhere bike employs each and every step of the methods claimed in one or more claims of the '085 Patent.

63.    The FLY Anywhere bike employs each and every step of the methods claimed in one or more claims of the '276 Patent.

## COUNT I

### (Infringement of the '085 Patent)

64.    Peloton incorporates by reference paragraphs 1-63 and Exhibits 1-2 attached hereto.

65.    Peloton is the owner of all rights, title, and interest in the '085 Patent.  The '085 Patent issued on November 3, 2015.

66.     The '085 Patent is valid and enforceable.

67.     In violation of 35 U.S.C. § 271(a), Defendant Flywheel makes, uses, offers to sell, and sells the FLY Anywhere bike and thereby directly infringes the '085 Patent.  The FLY Anywhere bike employs every step of the methods claimed in one or more claims of the '085 Patent.  Flywheel thereby directly infringes one or more claims of the '085 Patent.

68.     In violation of 35 U.S.C. § 271(b), Defendant Flywheel advertises to, sells to, encourages, and instructs third parties, including Flywheel customers, to practice every step of the methods claimed in the '085 Patent.  Flywheel thereby induces infringement of one or more claims of the '085 Patent, by having the specific intent to induce its customers to infringe the '085 Patent, despite knowledge that its customers' acts infringe the '085 Patent.

69.     In violation of 35 U.S.C. § 271(c), Defendant Flywheel offers to sell and sells material components of the '085 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including Flywheel's customers.  Flywheel has thereby contributorily infringed and continues to contributorily infringe one or more of the claims of the '085 Patent, despite its knowledge that material components are especially made or especially adapted for use in an infringement of the '085 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

70.     Defendant Flywheel knew of the '085 Patent prior to the filing of this action at least due to Peloton's identification of the '085 Patent in the October 24, 2017 letter that was sent to Flywheel's Chief Executive Officer and Executive Chairman.

71.     Defendant Flywheel's infringement is willful.

72.     Peloton has suffered and continues to suffer damages and irreparable harm because of Defendant Flywheel's past and ongoing infringement.

73.     Unless Defendant Flywheel's infringement is enjoined, Peloton will continue to be damaged and irreparably harmed.

74.     Peloton meets the criteria for, and is entitled to, temporary, preliminary, and permanent injunctive relief.

## COUNT II

### (Infringement of the '276 Patent)

75.     Peloton incorporates by reference paragraphs 1-74 and Exhibits 1-2 attached hereto.

76.     Peloton is the owner of all rights, title, and interest in the '276 patent.  The '276 patent issued on January 12, 2016.

77.     The '276 patent is valid and enforceable.

78.     In violation of 35 U.S.C. § 271(a), Defendant Flywheel makes, uses, offers to sell, and sells the FLY Anywhere bike and thereby directly infringes the '276 Patent.  The FLY Anywhere bike employs every step of the methods claimed in one or more claims of the '276 Patent.  Flywheel thereby directly infringes one or more claims of the '276 Patent.

79.     In violation of 35 U.S.C. § 271(b), Defendant Flywheel advertises to, sells to, encourages, and instructs third parties, including Flywheel customers, to practice every step of the methods claimed in the '276 Patent.  Flywheel thereby induces infringement of one or more claims of the '276 Patent, by having the specific intent to induce its customers to infringe the '276 Patent, despite knowledge that its customers' acts infringe the '276 Patent.

80.     In violation of 35 U.S.C. § 271(c), Defendant Flywheel offers to sell and sells material components of the '276 Patent that have no substantial non-infringing use and constitute a material part of the invention, to third parties including Flywheel's customers.  Flywheel has

thereby contributorily infringed and continues to contributorily infringe one or more of the

claims of the '276 Patent, despite its knowledge that material components are especially made or

especially adapted for use in an infringement of the '276 Patent, and not a staple article or

commodity of commerce suitable for substantial non-infringing use.

81.     Defendant Flywheel knew of the '276 patent prior to the filing of this action at

least due to Peloton's identification of the '276 patent in the October 24, 2017 letter that was sent

to Flywheel's Chief Executive Officer and Executive Chairman.

82.     Defendant Flywheel's infringement is willful.

83.     Peloton has suffered and continues to suffer damages and irreparable harm

because of Defendant Flywheel's past and ongoing infringement.

84.     Unless Defendant Flywheel's infringement is enjoined, Peloton will continue to

be damaged and irreparably harmed.

85.     Peloton meets the criteria for, and is entitled to, temporary, preliminary, and

permanent injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Peloton respectfully asks that the Court enter judgment against

Defendant Flywheel as follows:

86.     That Defendant Flywheel has infringed (either literally or under the doctrine of

equivalents) directly, jointly, and/or indirectly by way of practicing, inducing or contributing to

the infringement of one or more claims of the Peloton Patents;

87.     That Defendant Flywheel's infringement of the Peloton Patents was willful;

88.     For temporary, preliminary, and permanent injunctive relief enjoining Defendant

Flywheel and its officers, directors, agents, affiliates, employees, divisions, branches,

subsidiaries, parents, and all others acting in active concert or participation with it, from infringement, inducing the infringement, or contributing to the infringement of the Peloton Patents;

89.     For an award to Peloton for its damages, costs, expenses, and prejudgment and post-judgment interest for Defendant Flywheel's infringement of the Peloton Patents;

90.     For an award to Peloton for enhanced damages equal to treble the amount of actual damages, for the willful nature of Defendant Flywheel's acts of infringement as to the Peloton Patents, with notice being made at least as early as October 24, 2017 for the '085 and '276 patents, as provided under 35 U.S.C. § 284;

91.     Reasonable attorneys' fees and costs against Defendant Flywheel;

92.     For any and all other relief to which Peloton may show itself to be entitled.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated:  September 12, 2018                    Respectfully Submitted,

By:  /s/ Steven N. Feldman
    Steven N. Feldman (CA SBN 281405)
    HUESTON HENNIGAN LLP
    Alexander C.D. Giza (CA SBN 212327)
    Douglas J. Dixon (CA SBN 275389)
    Xinlin L. Morrow (CA SBN 281707)
    Jenna Williams (CA SBN 307975)
    Neil Anderson (CA SBN 307668)
    523 West Sixth Street, Suite 400
    Los Angeles, CA 90014
    Tel: (213) 788-7272
    Fax: (888) 775-0898
    sfeldman@hueston.com
    agiza@hueston.com
    ddixon@hueston.com
    xmorrow@hueston.com
    jwilliams@hueston.com

nanderson@hueston.com

Melissa Smith (Texas Bar No. 24001351)
GILLAM SMITH LLP
303 South Washington Avenue
Marshall, Texas 75670
Tel: (903) 934-8450
Fax: (903) 934-9257
melissa@gillamsmithlaw.com

*Attorneys for Plaintiff Peloton Interactive, Inc.*